**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | |
|---|---|
| CYNTHIA JOYCE SLEDGE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>GRAPHIC PACKAGING )<br>INTERNATIONAL, INC., )<br>)<br>Defendant. ) | 1:12CV1141 |

**MEMORANDUM OPINION AND ORDER**

This suit arises from Plaintiff's termination from her employment with Defendant subsequent to an injury suffered during the scope of her work. Plaintiff alleges violations of the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. Stat. §§ 95-240, et seq. ("REDA") and the North Carolina Persons with Disabilities Protection Act, N.C. Gen. Stat. §§ 168A-1, et seq. ("NCPDPA"). See generally Doc. #4.[1] Now before the Court is Defendant's Motion for Summary Judgment (Doc. #19). See Docket Entry dated Oct. 11, 2013. For the reasons that follow, the instant Motion will be GRANTED.

---

[1] Plaintiff filed this action in the General Court of Justice, Superior Court Division, Guilford County, North Carolina. See Doc. #4. Defendant removed this action to this Court pursuant to 28 U.S.C. § 1332 on the basis that Plaintiff is a resident of Guilford County, North Carolina, that Defendant is a Delaware corporation with its principle place of business in Georgia, and that the amount in controversy exceeds $75,000. See Doc. #1, ¶¶ 3-5. Although Plaintiff phrased the claims in her Complaint in terms of "Wrongful Termination in violation of the public policy of the state of North Carolina, namely [REDA and the NCPDPA]" (see Doc. #4 at 7), the Parties have treated that language as asserting direct violations of REDA and the NCPDPA (see Docs. #19, 20, 21, 23) and such is a reasonable reading of the Complaint given that prior paragraphs in the Complaint assert direct violations of those statutes (see Doc. #4, ¶¶ 23, 29), that Plaintiff seeks relief specifically authorized under those statutes (see Doc. #4 at 7; N.C. Gen. Stat. § 95-243), and that Plaintiff's Complaint is accompanied by a Right to Sue Letter from the North Carolina Department of Labor addressing an asserted violation of REDA (see Doc. #4-1). Accordingly, Plaintiff's claims are likewise addressed as asserting direct violations of REDA and the NCPDPA in this Memorandum Opinion and Order.

I.

The material facts, viewed in the light most favorable to Plaintiff, are as follows. Defendant manufactures custom packaging products. At the time of the incident giving rise to this action, Plaintiff worked as a Sheeter Operator in Defendant's Greensboro, North Carolina, plant, which produces custom labels. See Doc. #19-2 at 26:15-18; Doc. #19-1, ¶¶ 1-3.[2] A sheeter is a machine that cuts paper into the appropriate size for Defendant's printing department to produce labels to its customers' specifications. See Doc. #19-1, ¶ 8. The sheeter machine itself is large - approximately 50 feet long and six to ten feet high. See id.; see also Doc. #21-1, ¶ 3.

The paper used in the sheeter is in rolls. See Doc. #19-1, ¶ 10. Two roll stands for the paper sit behind the sheeter. See id. Typically, a roll of paper is put on the forward roll stand and fed, or "webbed," through the sheeter. See id.; see also Doc. #19-2 at 32:21-33:3. After passing through various rollers, the paper runs under a blade. See Doc. #19-1, ¶ 11. The cut paper then exits the front of the machine where is it stacked on a pallet. See Doc. #19-2 at 33:7-18. If two rolls of paper are run at the same time, the back roll stand is also used. See Doc. #19-1, ¶ 10. The paper running through the sheeter is referred to as the "web." See id., ¶ 12.

Because the paper is fed from rolls, it may retain curl after running through the sheeter. See Doc. #19-1, ¶ 14. To reduce curl, Plaintiff was accustomed to using a process whereby she and another employee would place a pallet on top of the cut paper and then would use a forklift to lift the paper

---

[2] All pin citations, with the exception of citations to deposition testimony, refer to the pagination in the CM/ECF footer. Pin citations to deposition testimony filed in connection with the Parties' summary judgment filings refer to the page and line numbers reflected on the original documents.

and a clamp truck to flip the paper. See Doc. #19-2 at 35:21-25; Doc. #19-1, ¶¶ 17-18. To simplify this process, Defendant purchased a machine referred to as the EZ Flipper that flipped the paper without using a forklift or clamp truck. See Doc. #19-2 at 36:3-9. Plaintiff testified that she was not comfortable using the EZ Flipper. See id.

On March 31, 2012, Plaintiff began her shift at 7 p.m. At that time, Plaintiff was working on a new project that required running paper, thicker than normal, through the sheeter. See id. at 34:14-17. The paper had one slick side, considered the top, and one coarse side, considered the bottom. See Doc. #19-4 at 31:19-32:5. Due to the paper's thickness, it retained significant curl after running through the sheeter. See Doc. #19-2 at 34:15-17. In an effort to eliminate the need to flip the paper, Plaintiff attempted to run the paper through the sheeter upside down (i.e., coarse side up) and put the paper on the back roller instead of the front. See id. at 34:23-35:10. Although Plaintiff had run this paper through the sheeter on at least one prior occasion, she had never used this method. See id. at 34:19-20.

Shortly before midnight, after Plaintiff fed the paper through the sheeter and after the sheeter began operation, Plaintiff tapped the web with her hand to test the tension. See id. at 35:11-13.[3] When Plaintiff tapped the web, her hand was pulled between rollers in the sheeter. See id. Plaintiff was able to remove her hand and reported her injury first to a nearby fellow employee and then to Carolyn White, a member of Defendant's safety team. See id. at 45:4-46:2. Ms. White left a voicemail for Printing Department Manager Dan Grannan (see Doc. #21-3 at 1; Doc. #19-2 at 46:13-14) and also contacted Plant

---

[3] If the tension is incorrect, the sheeter will produce short sheets of paper. See Doc. #19-2 at 39:18-21.

Manager Cindy Wyatt (see Doc. #19-2 at 46:3-12). After speaking with Ms. Wyatt, Ms. White drove Plaintiff to the hospital. See Doc. #19-2 at 48:8-11. X-rays taken at the hospital revealed that Plaintiff's hand was not broken and that it was "[m]ore swelling than anything." Doc. #19-2 at 50:6-9. The doctor recommended that Plaintiff keep her hand elevated and limited her to one-handed work. See id. at 50:8-24.

While Plaintiff was at the hospital, Mr. Grannan received Ms. White's message and traveled to the plant. See Doc. #21-3 at 1. There, he inspected the machine with maintenance technician Jimmy Smith and did not find any defects. See id. at 2. Mr. Grannan and Mr. Smith determined from the condition of sheets in the waste bin that Plaintiff's injury occurred while the sheeter was running. See id. Shortly after 2 a.m., Mr. Grannan spoke with Ms. White at the hospital and she informed him that Plaintiff did not have any broken bones but that her hand was badly bruised. See Doc. #21-3 at 2-3. Plaintiff returned to the plant at 4 a.m., and Mr. Grannan interviewed Plaintiff with respect to the events surrounding her injury. See Doc. #19-2 at 55:14-23. At that time, Plaintiff discussed her plan of filing a worker's compensation claim with Mr. Grannan. See Doc. #21-1, ¶ 7. After concluding his interview, Mr. Grannan told Plaintiff to go home and to take the remainder of that shift and the following day off. See Doc. #19-3 at 43:8-11; Doc. #21-1, ¶ 8.

Plaintiff returned to work on April 2, 2012. See Doc. #21-1, ¶ 11. At this time, Plaintiff did not work, but met with Human Resource manager Philip Tacy, who also interviewed Plaintiff regarding the circumstances surrounding her injury. See id. Plaintiff avers that at this meeting, she "asked more questions about workers' compensation and how [her] doctor's appointments would be paid for and whether [she] would receive pay for the days [she] could

-4-

not work" and Mr. Tacy responded by telling her to go home. Id. Mr. Grannan informed Plaintiff the following day that they were continuing to investigate the accident and would contact her when that process was complete. See id., ¶ 12. On April 9, 2012, Ms. Wyatt called Plaintiff and informed her that she was terminated for violating one of Defendant's Safety Absolutes. See id., ¶ 13. By letter dated that same day, Mr. Tacy informed Plaintiff of the same. See Doc. #19-2 at 49.

A Safety Absolutes Policy document describes Defendant's Safety Absolutes as follows:

1. Lockout / Tag out violation
2. Intentionally bypassing, removing or disabling a safety device.
3. Reaching into moving equipment in violation of established safe operating procedures.
4. Operating a powered industrial vehicle in a reckless or threatening manner.
5. Placing yourself or another employee in serious danger.

Doc. #19-2 at 34. That document further states: "The potential of some unsafe acts is so serious that normal progressive disciplinary steps may be bypassed. In these cases, referred to as **SAFETY ABSOLUTES**, the action will result in immediate suspension and termination unless extraordinary circumstances exist." Id. (capitalization and bolding in original). Plaintiff acknowledges that she was familiar with the Safety Absolutes (see Doc. #19-2 at 27:9-21) and documentary evidence reflects her attendance at training and re-training on Defendant's Safety Absolutes (see id. at 36-40).

As a result of the foregoing events, Plaintiff filed the instant action contending that, "after she questioned [Defendant] about filing a workers'

compensation claim, she was retaliated against by the Defendant Company. Said retaliation included, but was not limited to, being sent home from work without cause and pay, and wrongful termination." See Doc. #4, ¶ 18. Plaintiff further contends that, "after suffering her work related injury . . ., [Defendant] regarded and considered her to be disabled" and that "she was also terminated for being injured on the job due to no fault of her own." See id., ¶¶ 24-25. Defendant has now filed the instant Motion for Summary Judgment. See Doc. #19. Plaintiff responded (Doc. #21), and Defendant replied (Doc. #23).

II.

Summary judgment is proper only when, viewing the facts in the light most favorable to the non-moving party, there is no genuine issue of any material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Holland v. Washington Homes, Inc., 487 F.3d 208, 213 (4th Cir.2007). An issue is genuine if a reasonable jury, based on the evidence, could find in favor of the non-moving party. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Holland, 487 F.3d at 213. The materiality of a fact depends on whether the existence of the fact could cause a jury to reach different outcomes. See Anderson, 477 U.S. at 248. Summary judgment requires a determination of the sufficiency of the evidence, not a weighing of the evidence. See id. at 249. In essence, the analysis concerns "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251–52.

III.

Plaintiff brings her first claim for relief under REDA. "The North Carolina [REDA] prohibits discrimination or retaliation against an employee for filing a worker's compensation claim." Wiley v. United Parcel Serv., Inc., 164 N.C. App. 183, 186, 594 S.E.2d 809, 811 (2004). To establish her REDA claim, Plaintiff must show that: (1) she exercised her right to engage in protected activity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the exercise of the protected activity and the alleged retaliatory action. See Edwards v. PCS Phosphate Co., Inc., 812 F. Supp. 2d 689, 693 (E.D.N.C. 2011) (citing Brackett v. SGL Carbon Corp., 158 N.C. App. 252, 259, 580 S.E.2d 757, 762 (2003)).[4] Once Plaintiff establishes a prima facie case of retaliatory discharge, the burden shifts to Defendant to show, by a preponderance of the evidence, that it "would have taken the same unfavorable action in the absence of the protected activity of the employee." Wiley, 164 N.C. App. at 186, 594 S.E.2d at 811; see also N.C. Gen. Stat. § 95-241(b). It then becomes Plaintiff's burden to show that the reason offered by Defendant is merely a pretext for its retaliatory action. See Lilly v. Mastec N. Am., Inc., 302 F. Supp. 2d 471, 481 (M.D.N.C. 2004) (Eliason, M.J.).

As an initial matter, for purposes of the instant Motion, Defendant does not dispute that Plaintiff satisfies the first two elements of a prima facie case (see Doc. #20 at 11) but contends that Plaintiff has failed to satisfy the third

---

[4] "The North Carolina courts have held that plaintiffs may generally rely on the evidentiary standards employed in federal discrimination claims to establish REDA claims." Lilly v. Mastec N. Am., Inc., 302 F. Supp. 471, 480 (M.D.N.C. 2004) (Eliason, M.J.). Accordingly, Plaintiff may offer direct evidence or proceed under the burden shifting scheme set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See id. Plaintiff has not offered direct evidence of retaliatory discharge.

element because "Plaintiff has no evidence of a causal connection" (id. at 12). However, because "[t]he causal connection element can be satisfied by a showing of close temporal proximity between the exercise of the protected activity and the alleged retaliatory employment action, or a pattern of conduct," Tuan H. Nguyen v. Austin Quality Foods, Inc., 2013 WL 5356880, at *3, ___ F. Supp. 2d ___, ___ (E.D.N.C. Sept. 14, 2013) (citing Smith v. Computer Tast Grp., Inc., 568 F. Supp. 2d 603, 614 (M.D.N.C. 2008) (citations omitted) (Schroeder, J.)), and because Defendant suspended Plaintiff immediately and terminated Plaintiff within ten days of her injury and her inquiries regarding the filing of a workers' compensation claim, Plaintiff has established a prima facie case for purposes of the instant Motion. See Shoaf v. Kimberly-Clark Corp., 294 F. Supp. 2d 746, 756 (M.D.N.C. 2003) ("[M]erely the closeness in time between the filing of a discrimination charge and an employer's firing an employee is sufficient to make a prima facie case of causality.") (Bullock, J.).

Regardless, Plaintiff's claim cannot survive summary judgment because Defendant has offered sufficient evidence that it would have terminated Plaintiff even in the absence of a workers' compensation claim, and Plaintiff has failed to offer evidence for a reasonable fact finder to conclude that Defendant's proffered reasons for Plaintiff's termination amount to pretext. That is, in the days following Plaintiff's injury, Mr. Grannan conducted an investigation in which he concluded that the sheeter was not defective, that the sheeter was running during the time of the incident, and that, while the sheeter was running, Plaintiff "tapped the web with her hand to see how much tension was there was [sic] and that is when her fingers were pulled in between the rollers." Doc. #21-3 at 3. Furthermore, Mr. Tacy conducted his own investigation, during which he sought information regarding whether Plaintiff had used her described

procedure before to check paper tension and why Plaintiff would place her hand where she did "[w]ith the pinch point placards in the area." Doc. #19-2 at 47-48. Mr. Tacy recommended that Defendant terminate Plaintiff for violating a Safety Absolute and Ms. Wyatt, the Greensboro Plant manager, avers that she concurred with Mr. Tacy's recommendation that Plaintiff be terminated for violating a Safety Absolute by placing her hand into the sheeter. See Doc. #19-1, ¶¶ 26, 28. Mr. Tacy ultimately penned the letter to Plaintiff, dated April 9, 2012, noting: "The results of the investigation indicate that you did violate [Defendant's] Safety Absolutes. As a result, your employment with [Defendant] is being terminated effective today." See id. at 19-1.

In addition, Ms. Wyatt avers that "[t]here has been no employee who violated the Safety Absolutes and who was not terminated" including two who did not pursue a worker's compensation claim. Doc. #19-1, ¶ 29. Ms. Wyatt also provides that, in the last three years, two employees other than Plaintiff suffered work-related injuries and filed workers' compensation claims. Id. Yet, in those two cases, the individuals at issue did not violate a Safety Absolute and were not terminated. Id.

In response, Plaintiff argues that a genuine issue of material fact exists because Mr. Grannan's investigation "lacks credibility." Doc. #21 at 12. In support, Plaintiff argues that Mr. Grannan reenacted Plaintiff's injury without Plaintiff present to demonstrate how her injury occurred and that he "took photographs of himself to depict the injury when he clearly could have taken photographs of [Plaintiff] re-enacting the injury." See Doc. #21 at 12. As an initial matter, any argument regarding the deficiency of Mr. Grannan's investigation rings hollow in light of the fact that Mr. Grannan's written summary, which concludes that, as the sheeter was running, Plaintiff "tapped

the web with her hand to see how much tension there was and that is when her fingers were pulled in between the rollers" (Doc. #21-3 at 3) is consistent with Plaintiff's own description of events (see Doc. #21-1, ¶ 4 ("I tapped or touched the paper with my hand to feel the tension of the paper, and that is when my hand was pulled into the roller.")). Moreover, Mr. Grannan neither provided the ultimate conclusion that Plaintiff violated a Safety Absolute, nor was Mr. Grannan responsible for the decision to terminate Plaintiff. See Doc. #21-2 at 53:2-18. Furthermore, regardless of the adequacy of Mr. Grannan's investigation, there is no evidence to support a finding that Mr. Grannan did not intend for his investigation to be an accurate representation of the circumstances surrounding Plaintiff's injury such that it could be considered a sham or that Mr.Tacy and Ms.Wyatt, who were responsible for the decision to terminate Plaintiff (see id. at 66:14-19), did not believe Mr. Grannan's report to be accurate. Accordingly, Plaintiff's argument regarding the adequacy of Mr. Grannan's investigation fails to create a genuine issue of material fact.

Plaintiff further argues:

> [Defendant] contends that [Plaintiff] was terminated because she violated a "Safety Absolute", by reaching ***into*** moving equipment. [Plaintiff] vehemently denies that she reached into moving equipment. [Plaintiff] has produced evidence that [Defendant's] reason for terminating her lacks credibility and is disputed because 1) [Plaintiff] vehemently denied reaching into moving equipment, 2) the employer has no evidence that [Plaintiff] reached into moving equipment, and 3) [Defendant] provided no training on using the equipment.

Doc. #21 at 12 (italics and bolding in original). These arguments also fail. The Parties' dispute as to whether Plaintiff's action of tapping the web near the rollers constituted placing her hand into the sheeter and thus a violation of Defendant's Safety Absolutes is not relevant to the instant analysis. "'[I]t is not [the Court's] province to decide whether the reason was wise, fair, or even

correct, ultimately, so long as it truly was the reason for [P]laintiff's termination.'" Hawkins v. Pepsico, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (quoting DeJarnette v. Corning Inc., 133 F.3d 293, 299 (4th Cir. 1998)). Although Plaintiff may disagree with Defendant's interpretation of Plaintiff's action as it relates to the relevant Safety Absolute, Plaintiff has offered no evidence that Defendant did not consider that action to constitute a violation and that such was the actual reason for her termination.[5] In a similar vein, whether Defendant provided training on using the equipment does not weigh on whether Defendant's stated reasons for Plaintiff's termination constitute pretext. Accordingly, because Plaintiff fails to offer sufficient evidence for a reasonable fact finder to conclude that Defendant's stated legitimate reasons for Plaintiff's termination constitute pretext, Plaintiff's first claim for relief cannot survive summary judgment.

IV.

As to Plaintiff's second claim for relief, the NCPDPA makes it unlawful for an employer "to discharge, or otherwise to discriminate against a qualified person with a disability on the basis of a disabling condition with respect to compensation or the terms, conditions, or privileges of employment." N.C. Gen. Stat. § 168A-5(a)(1). A person with a disability "means any person who (i) has a physical or mental impairment which substantially limits one or more major life activities; (ii) has a record of such impairment; or (iii) is regarded as having such an impairment." N.C. Gen. Stat. § 168A-3(7a). A "physical or

---

[5] Plaintiff's Response cites page 22 of a deposition of Plaintiff's co-worker for the statement that "There was nothing unusual, nor was it a violation of the Safety Absolute to tap or touch the paper that way." Doc. #21 at 2. Page 22 of that deposition offers no testimony supporting this statement. See Doc. #21-5 at 22. Plaintiff's own declaration regarding the same does not reflect on whether Defendant viewed that action as a violation of the Safety Absolutes.

-11-

mental impairment" includes "any physiological disorder or abnormal condition, cosmetic disfigurement, or anatomical loss, caused by bodily injury, birth defect or illness, affecting a body system, including, but not limited to, neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive; digestive; genitourinary; hemic and lymphatic; skin; and endocrine" but excludes "any disorder, condition or disfigurement which is temporary in nature, lasting six months or fewer, and leaving no residual impairment." Id. "Is regarded as having an impairment" means:

> (i) has a physical or mental impairment that does not substantially limit major life activities but that is treated as constituting such a limitation; (ii) has a physical or mental impairment that substantially limits major life activities because of the attitudes of others; or (iii) has none of the impairments defined in paragraph a. of this subdivision but is treated as having such an impairment.

Id. Plaintiff contends that Defendant regarded her has having an impairment protected under the NCPDPA as a result of her injury and improperly discriminated against her based on that perceived impairment. See Doc. #21 at 14-15.

Plaintiff's evidence that Defendant regarded her as having an impairment is entirely insufficient to survive summary judgment. The evidence viewed in the light most favorable to Plaintiff demonstrates that between the time of Plaintiff's injury and her termination, Defendant was aware only that x-rays revealed no broken bones, that Plaintiff's hand was badly bruised, and that, as a result, she may be limited to one-handed work for some period of time. See, e.g., Doc. #19-1, ¶ 31; Doc. #19-2 at 49:10-18, 50:6-9; Doc. #19-3 at 36:9-13, 37:15-18, 43:11-13.[6] Simply put, there is no evidence that Defendant had

---

[6] The full extent of Plaintiff's injury is not revealed in the Parties' summary judgment filings, though there are indications that Plaintiff eventually required surgery (continued...)

any information suggesting that Plaintiff's injury may constitute an impairment protected by the NCPDPA or that Defendant regarded, or treated, Plaintiff as having such an impairment. Indeed, the evidence is overwhelmingly to the contrary in that Defendant knew only of an injury that was likely to affect Plaintiff temporarily and to heal completely. Accordingly, Plaintiff's second claim for relief also cannot survive summary judgment.

V.

For the reasons set forth above, Defendant's Motion for Summary Judgment (Doc. #19) is GRANTED.

Defendant's Motion in Limine (Doc. #32) is DISMISSED AS MOOT.

This the 19th day of March, 2014.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge

---

[6](...continued)
and physical therapy to regain full range of motion in her hand. See Doc. #19-2 at 55:2-10; Doc. #21-4 at 15:21-24.